***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford. The appealing party has shown good ground *Page 2 
to reconsider the evidence. Having reviewed the competent evidence of record, the Full Commission rejects the findings of fact found in the Opinion and Award of Deputy Commissioner Ledford and enters the following Opinion and Award in accordance with the North Carolina Court of Appeals Opinion file December 16, 2008.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff and defendant at the times in question.
3. Defendant is a duly qualified self-insured with Risk Management Services acting as the servicing agent.
4. Plaintiff's average weekly wage is $434.13, yielding a compensation rate of $289.42 per week.
5. Defendant admits that plaintiff sustained an injury to her head and back on December 6, 2003, and that the injury arose out of and in the course of her employment and is compensable.
6. Extensive and various medical records and other documents have been stipulated into evidence with the pre-hearing agreement.
7. On May 3, 2006, Deputy Commissioner Ledford approved the Consent Order of the parties, which provided that the defendant would reinstate plaintiff's ongoing temporary total disability compensation payments, to continue until $60,000 would be paid to plaintiff or until *Page 3 
final decision by the Commission in this case. Pursuant to that Order, attorney Randy Duncan receives twenty-five percent of the ongoing compensation as an attorney's fee. The Order also corrected the average weekly wage and compensation rate, which is set forth above. The compensation rate of $289.42 was incorrectly referred to in the Pre-Trial Agreement as the average weekly wage.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 52 years of age. She has her G.E.D. and has completed courses, earning a business certificate from Western Piedmont Community College. Plaintiff was employed by defendant as a bookkeeper from 1999 until 2004 at retail store number 1534 in Morganton, North Carolina. Prior to her employment with defendant, plaintiff had been employed as a tax preparer, bookkeeper, operator of a bingo parlor, customer service manager, and in various positions in the food service industry.
2. Prior to plaintiff's December 6, 2003 injury, plaintiff had a pre-injury medical history of treatment for hypothyroidism, hypertension, asthma, osteopenia, depression, diabetes, and a cardiac catheterization procedure. Plaintiff also has a history of neck and back pain dating back to 2000 when plaintiff was involved in a motor vehicle accident and subsequently injured in a fall.
3. On Saturday, December 6, 2003 at about 7:00 a.m. plaintiff sustained an injury when she fell on ice in defendant's parking lot, landing on her back and head. Plaintiff was *Page 4 
unconscious for a short time and was not able to get up. Plaintiff was transported by ambulance to Grace Hospital Emergency Room where a contusion of her head was initially diagnosed. Later x-rays also indicated multiple rib fractures at the left sixth, seventh, eighth and ninth ribs.
4. On December 8, 2003, plaintiff presented to Dr. Sharon Boone, her family physician. Dr. Boone reviewed x-rays taken at the emergency room. Dr. Boone diagnosed plaintiff with head trauma, neck and back pain, and possible compression fracture at the T4 level. Plaintiff underwent an MRI of her thoracic spine on December 30, 2003, which showed a thoracic compression fracture at T4 level with slight anterior wedging, but showed no findings to account for plaintiff's radicular symptoms.
5. From January 6, 2004 through November 24, 2004, plaintiff was treated conservatively by orthopedist Dr. Ralph Maxy, including a back brace, physical therapy and medications. On January 6, 2004, Dr. Maxy reviewed plaintiff's imaging studies and diagnosed plaintiff with a compression fracture at the T4 level. In a letter dated January 14, 2004 to Southern Rehabilitation Network, Dr. Maxy indicated that he wanted plaintiff to ambulate as much as possible and preferred that plaintiff remain as active as possible. On March 31, 2004, Dr. Maxy indicated that new x-rays showed that plaintiff's thoracic fracture had healed. Dr. Maxy noted that plaintiff could begin efforts to return to work and thought a work-conditioning program may be appropriate.
6. On February 26, 2004, plaintiff presented to Dr. Boone for depression. Plaintiff indicated that she was depressed because she was not able to look after her father who was dying because of her back problem. Dr. Boone also noted that plaintiff cries when talks about her father. At plaintiff's March 17, 2004, visit, Dr. Boone noted that plaintiff's father had died and diagnosed plaintiff with depression. At plaintiff's April 2004 visit, Dr. Boone increased *Page 5 
plaintiff's medication for her depression. Dr. Boone testified that she had treated plaintiff since June 2000 and that plaintiff's depression for which she had been prescribed medication pre-existed her December 2003 fall at work.
7. Plaintiff was also treated for pain by Dr. Glenn Paige of Unifour Pain Treatment on June 23, 2004. Dr. Paige noted that plaintiff has degenerative joint disease of the spine and a compression fracture of the thoracic spine. Dr. Paige prescribed medications for pain, replaced plaintiff's Flexeril with Skelaxin, and advised plaintiff to continue using her brace and to use her TENS unit.
8. On October 20, 2004, Dr. Maxy noted that plaintiff's MRI indicated that plaintiff's fracture had healed and that no additional treatment was recommended. Dr. Maxy further indicated that plaintiff was at maximum medical improvement.
9. On November 24, 2004, plaintiff saw Dr. Maxy with continued complaints of the same neck and upper spine symptoms. Dr. Maxy reviewed the results of a recent functional capacity evaluation (FCE), in which plaintiff's performance was assessed by the physical therapist as inconsistent and giving submaximal effort. Dr. Maxy released plaintiff from his care and assessed plaintiff at maximum medical improvement with a ten percent (10%) impairment rating to her back and restrictions of no lifting greater than 15 pounds, occasional bending, stooping, twisting, sitting and standing as tolerated, noting that her injury might cause her continued pain. However, as these restrictions were based on an FCE in which Dr. Maxy noted that plaintiff demonstrated inconsistent and submaximal effort and self-limiting behavior on 15 out of 20 items, the FCE and assigned restrictions do not reflect plaintiff's true abilities. After releasing plaintiff, the only further treatment Dr. Maxy had to offer was a referral for pain management, which plaintiff underwent with Dr. Paige. *Page 6 
10. On January 24, 2005 plaintiff was treated by Dr. Robert Yapundich, a board certified neurologist at Neurology Associates, for complaints of headaches. Dr. Yapundich diagnosed plaintiff with post-concussive headaches, cervical trapezius muscle spasms, and recommended another cervical MRI. Dr. Yapundich's partner, Dr. Richard Marcus, concluded that plaintiff's March 3, 2005 MRI of her cervical spine showing only mild disc bulges was unremarkable, could have pre-existed the 2003 injury, and that the findings were virtually asymptomatic in the majority of cases.
11. On February 16, 2005, Dr. Maxy approved plaintiff to return to work as a full-time customer service sales manager with defendant and acknowledged that the customer service sales manager position was within plaintiff's permanent work restrictions of no lifting over 15 pounds, no excessive bending, lifting, or stooping, and that plaintiff may sit or stand as tolerated.
12. On March 11, 2005, Dr. Paige reviewed plaintiff's March 3, 2005 MRI and indicated that he would not prescribe further pain medication to plaintiff due to plaintiff's symptom magnification. On June 10, 2005, Dr. Paige indicated again that he was hesitant to prescribe medication to plaintiff due to inconsistencies on plaintiff's exam and exaggerated symptoms. On September 2, 2005, upon review plaintiff's April 27, 2004 bone scan and her March 3, 2005 MRI, Dr. Paige noted that plaintiff's thoracic compression fracture had healed.
13. On April 1, 2005, in Dr. Yapundich's absence, plaintiff was treated by Dr. Marcus. Dr. Marcus noted that plaintiff arrived very angry and antagonistic. Plaintiff was adamantly convinced that the mild disk bulges seen on plaintiff's cervical area are the total cause of all of her discomfort and was angry when Dr. Marcus indicated that he could not treat this. Dr. Marcus further noted that plaintiff appeared to be fixated on the MRI as proof that she had *Page 7 
pain. When Dr. Marcus advised plaintiff that her recent cervical MRI was unremarkable plaintiff became very angry. Dr. Marcus recommended a psychiatric evaluation and pain management.
14. On June 1, 2005, plaintiff was seen by Susan E. Indenbaum, LCSW with Counseling and Psychology Resources on referral by Dr. Yapundich. Ms. Indenbaum noted that plaintiff appeared angry and when asked about her husband being on disability, plaintiff became defensive and almost hostile. Plaintiff voluntarily did not return for psychological treatment with Ms. Indenbaum. Plaintiff began receiving psychological treatment with psychologist Dr. Brian Simpson in July 2005. However, plaintiff did not make her attorney aware of this psychological treatment with Dr. Simpson until October 4, 2005 during a mediated settlement conference. Neither plaintiff's attorney nor defendant had any records from Dr. Simpson's treatment of plaintiff at the time of the mediation as plaintiff failed to present this information to her attorney or defendant.
15. Defendants approved treatment by Dr. Yapundich for plaintiff's complaints of headaches beginning August 24, 2005. Plaintiff remains under the care of Dr. Yapundich. Dr. Yapundich opined that plaintiff's condition had remained essentially unchanged over the past two years and that plaintiff was at or near maximum medical improvement.
16. On April 7, 2005, plaintiff filed a hearing request, seeking psychiatric treatment as a result of her work place injury. Defendants have continuously denied that plaintiff's need for psychological treatment is related to her work injury. On April 12, 2005, the Industrial Commission ordered the parties to participate in a mandatory mediation of the claim prior to proceeding to hearing. 17. A mediated settlement conference, pursuant to the Commission's previous order, was held on October 4, 2005. In attendance were plaintiff and her husband Richard Hinceman, *Page 8 
plaintiff's former attorney Kenneth Lee, and defendant's attorney Kurt Seeber. The mediator was attorney Reid McGraw.
18. During the mediated settlement conference the parties reached a settlement agreement, which provided that plaintiff would execute a clincher agreement for the sum of $60,000, plus payment of all related, authorized medical bills. Mr. Lee testified that the agreed upon settlement included future medical expenses and disability benefits. The Agreement was recorded by the mediator Reid McGraw on a written mediated settlement conference agreement form, which was signed by plaintiff, plaintiff's attorney, Mr. Lee, and defendant's attorney, Mr. Seeber on behalf of defendant, and Mr. McGraw. That agreement, which is part of the evidence, sets forth the additional details of the settlement agreement.
19. Defense counsel drafted the compromise settlement agreement and on October 12, 2005, forwarded a proposed final compromise settlement agreement to plaintiff's counsel Kenneth Lee by email, which Mr. Lee confirmed he received. On October 21, 2005, a hard copy of the final agreement with appropriate documentation was forwarded to plaintiff's counsel for signature.
20. Shortly thereafter, plaintiff's counsel informed defendant that plaintiff refused to sign the agreement and did not want to go through with the agreed upon settlement. Plaintiff then fired her attorney, Kenneth Lee, and on December 5, 2005, Mr. Lee moved to withdraw as plaintiff's attorney, which was allowed by the Commission.
21. On November 17, 2005 defendant filed a Form 33 hearing request with the Industrial Commission seeking enforcement of the mediated settlement conference agreement.
22. Psychiatrist Dr. Gerald Aronoff was retained by defendant to do a record review in this case and give his opinions on plaintiff's mental state or capacity. Dr. Boone, Dr. *Page 9 
Simpson, and Dr. Aronoff testified to the effect of plaintiff's medications and psychological condition on plaintiff's ability to participate in the October 4, 2005 mediated settlement conference and her ability to enter into the settlement agreement. After considering all of the testimony, medical evidence, and expertise of each doctor, the Full Commission gives greater weight to Dr. Aronoff's opinion with regard to plaintiff's mental capacity on the date of the mediation.
23. Dr. Aronoff opined that based on plaintiff's medications she reported taking the day of the mediation and her relevant medical records prior to the date of mediation, there is no evidence to suggest that plaintiff lacked the mental competence to understand or comprehend the consequences of her actions at the mediation. The Full Commission finds that based upon the greater weight of the evidence that there is insufficient evidence to show that plaintiff did not have the ability to understand the nature of entering into the agreement or its nature and consequences. Plaintiff knowingly signed the mediated settlement agreement.
24. Plaintiff's former attorney, Mr. Lee, testified and the Full Commission finds as fact that plaintiff's attorney was present at the mediation, had prepared for the mediation and reviewed the records involved in the claim, and had advised plaintiff of the mediation process prior to the mediation. Mr. Lee also testified that it is his practice to make sure that his clients understand the agreement prior to signing. Mr. Lee further testified that he explains to his clients that the clincher agreement is the entire agreement and that it ends their claim. Mr. Lee stated that he would not allow a client to sign a settlement agreement that was not fair to the client under all of the circumstances.
25. Plaintiff testified that she had never been found mentally incompetent by a legal body and a guardian had never been appointed to handle her affairs. Plaintiff has never been *Page 10 
institutionalized or hospitalized for any type of mental disorder. At the time of the agreement plaintiff has the ability to read and write and handle her own financial affairs. Plaintiff's husband, Richard Hinceman who was also present at the mediation testified that if he thought that his wife was mentally incompetent, he would not allow her to sign a document.
26. Based upon the greater weight of the evidence, the undersigned find that plaintiff had sufficient mental capacity to enter into the settlement agreement, that plaintiff understood the nature and scope and effect of his actions, and its consequences. There was insufficient evidence to support a finding that plaintiff lacked the required capacity at the time plaintiff signed the mediated settlement agreement. The undersigned further find that the agreement was fair and just to all parties at the time the agreement was entered into.
27. Following the October 4, 2005 mediated settlement conference plaintiff has continued to receive treatment for her neck and back and psychological condition.
28. The greater weight of the credible medical evidence shows that plaintiff's depression and other psychological conditions were not caused or aggravated by her December 6, 2003 injury.
29. The Full Commission finds that under the circumstances in this case, the agreed upon attorney's fee in the compromise settlement agreement of $12,000.00 is unreasonable. The Full Commission further finds that an attorney's fee of twenty-five percent of the agreed upon settlement amount equating to $15,000.00 is reasonable based upon the procedural facts of this case.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following: *Page 11 
 CONCLUSIONS OF LAW
1. The person seeking to avoid the contract has the burden of proving that he lacked the mental capacity to enter into a contract.Ridings v. Ridings, 55 N.C. App. 630, 633, 286 S.E. 2d 614, 616
(1982). Plaintiff has failed to meet her burden of proof. Plaintiff possessed the mental capacity to enter into the compromise settlement agreement at the time of the mediated settlement conference on October 4, 2005.
 . . . a person has mental capacity sufficient to contract if he knows what he is about [Moffit v. Witherspoon, 32 N.C. 185; Paine v. Roberts, 82 N.C 451], and that the measure of capacity is the ability to understand the nature of the act in which he is engaged and its scope and effect, or its nature and consequences, not that he should be able to act wisely or discreetly nor to drive a good bargain, but that he should be in such possession of his faculties as to enable him to know at least what he is doing and to contract understandingly.
Ridings, 55 N.C. App. 630, 633, 286 S.E. 2d 614, 616
(1982) (citing Sprinkle v. Wellborn, 140 N.C. 163, 181,52 S. E. 666, 672 (1905)). At the time of the compromise settlement agreement, plaintiff understood the nature of the agreement, the manner in which his rights and interests would be affected by the agreement, and the consequences of entering into the agreement.Id. The evidence is insufficient to establish that plaintiff's depression, or her psychological state otherwise, or the medications she was taking at the time of the agreement rendered her without the capacity or ability to understand the nature or effect of her actions. Plaintiff possessed the mental capacity and ability to manage her affairs at the time of mediation, and knowingly signed the agreement. See Mangum v. Brown, 200 N.C. 296,156 S.E. 535 (1931); Cox v. Jefferson-PilotFire Casualty Co., 80 N.C. App. 122, 341 S.E.2d 608 (1986).
2. Compromise settlement agreements "are governed by general principles of contract law." Lemly v. Colvard Oil Co., 157, N.C. App. 99 (2003), citing Chappell v. Roth, 353 N.C. 690,692, *Page 12 reh'g denied, 354 N.C. 75 (2001). "It is a well-settled principle of contract law that a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement." Northington v. Michelotti, 121 N.C. App. 180,184, 464 S.E.2d 711, 714 (1995).
3. The language of the October 4, 2005 mediated settlement conference agreement contains all essential terms necessary for such agreement and the terms are sufficiently definite and certain. The agreement also fully complies with N.C.I.C. Rule 502(2). Defendant prepared a compromise settlement agreement in accordance with the requirements of the North Carolina Workers' Compensation Act and the mediated settlement conference agreement and forwarded it to plaintiff, through her counsel in a timely fashion. The Agreement therefore satisfies the requirements of Lemly and complies with the requirements of the Act and constitutes a valid compromise settlement agreement subject to approval by the Industrial Commission. N.C. Gen. Stat. § 97-17
4. Even if a mediated settlement agreement may constitute a binding agreement under contract law, the Commission must still consider the agreement for approval pursuant to Rule 502. "Only those agreements deemed fair and just and in the best interest of all parties will be approved." N.C.I.C. Rule 502; See also Lemlyv. Colvard Oil Co., 157 N.C. App. 99, 577 S.E.2d 712 (2003). In making a determination of whether an agreement is fair and just, the Industrial Commission must consider the evidence presented at the time of the agreement. Lewis v. Craven Reg'l Med. Ctr.,134 N.C. App. 438, 518 S, E, 2d 1 (1999). The Industrial Commission may not set aside an agreement "merely because one party to the agreement acquired new information or evidence." Glenn v.McDonald's, 109 N.C. App. 45, 49, 425 S.E. 2d 727, 730 (1993). *Page 13 
Plaintiff had sufficient time to present additional information concerning her medical and psychological condition prior to the mediation, but failed to do so. Id.
5. The undersigned have considered the mediated settlement agreement entered into by the parties in which plaintiff's claim is settled through a clincher agreement for the total amount of $60,000. Although plaintiff has presented additional evidence subsequent to the time of the mediation of psychological and medical treatment, the undersigned find that the mediated settlement agreement entered into by the parties on October 4, 2005 was fair and just to all parties at the time the agreement was entered into. Therefore, the mediated settlement agreement shall be enforced. N.C. Gen. Stat. § 97-17(b)(1); N.C.I.C. Rule 502.
6. The Compromise Settlement Agreement sought to be enforced references an Exhibit "A" as a list of all known medical expenses for authorized medical care and treatment arising out of this claim through the date of the agreement. Although the Exhibit "A" was not attached and submitted to the Commission, defendants have agreed to pay all approved medical expenses. Therefore, the Industrial Commission may approve the settlement agreement without the Exhibit "A" pursuant to N.C. Gen. Stat. § 97-17(b).
7. There must be proof of a causal relationship between the injury and the employment. Booker v. Medical Center, 297 N.C. 458,256 S.E.2d 189 (1979). Where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury. Click v. Freight Carriers, 300 N.C. 164,265 S.E.2d 389 (1980). Plaintiff has failed to prove by the greater weight of the evidence that her depression and her other psychological conditions were caused by or aggravated by her December 6, 2003 injury. *Page 14 
8. Plaintiff's former attorney, Kenneth Lee who represented plaintiff throughout the mediation process and was required to testify in this matter, is entitled to a reasonable attorney's fee of twenty-five percent of the $60,000.00 agreed upon settlement amount equating to an attorney's of $15,000.00.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant's Motion to enforce the mediation settlement agreement form is hereby GRANTED.
2. Defendant shall pay plaintiff pursuant to the terms of the final settlement agreement. Defendant is due a credit towards settlement amounts owed for all temporary total disability benefits paid to plaintiff pursuant to the May 3, 2006 consent order between the parties that was previously approved by Deputy Commissioner Kim Ledford.
3. As a result of the approval of the final settlement agreement, compliance with the agreement shall fully discharge defendant from any further liability under the Workers' Compensation Act for plaintiff's December 6, 2003 work injury giving rise to this claim.
4. A reasonable attorney's fee of 25% of the amount paid pursuant to the compromise settlement agreement is hereby approved to be deducted from the sums due plaintiff and paid directly to Attorney Kenneth Lee as plaintiff's counsel during the period of settlement negotiations.
5. Each side shall bear its own costs.
This the 24th day of November 2009. *Page 15 S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/___________________ DIANNE C. SELLERS COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER